

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 38th floor*
*New York, New York 10278*

September 30, 2024

**BY ECF AND EMAIL**

Honorable Mary Kay Vyskocil
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Deshaun Gregory*, 18 Cr. 315 (MKV)

Dear Judge Vyskocil:

    The Government respectfully submits this letter in connection with the sentencing of the defendant, Deshaun Gregory, scheduled for October 7, 2024 at 11:30 a.m., and in response to the defendant's sentencing memorandum, dated September 23, 2024 ("Def. Mem."). For the reasons stated below, the Government submits that a sentence within the applicable Guidelines Range of 8 to 14 months' imprisonment (the "Guidelines Range") as calculated in the Probation Department's Amended Violation Report would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

    **A.  Underlying Offense Conduct**

    On March 8, 2018, police officers from the New York City Police Department (the "Officers"), while on patrol in Bronx County, observed the defendant engaged in a conversation with another male. (PSR ¶ 7). At the time, the Officers knew that that there was an active arrest warrant for the defendant, and that he was wanted in connection with a separate investigation into an assault. (PSR ¶ 6). The Officers, who were familiar with the defendant based on prior interactions with him, approached the defendant and placed him under arrest based on the warrant. During a search incident to the arrest, the Officers found a .40 caliber semiautomatic pistol in the defendant's jacket pocket. (PSR ¶ 10). The Officers learned from a search of the defendant's criminal history that he had been previously convicted on February 9, 2016 in Bronx County Supreme Court of reckless endangerment in the first degree, in violation of New York State Penal Law section 120.25. (PSR ¶ 12).

    After waiving his *Miranda* rights, the defendant made statements to the police admitting that the gun was his and that he had purchased the firearm from a friend in exchange for $300.00. (PSR ¶ 11). The defendant reported that he was carrying the firearm for protection because he had previously been the victim of a shooting.

### B. Procedural History

On April 5, 2018, the defendant was charged by complaint with violating Title 18, United States Code, Section 922(g)(1). (ECF No. 1). The defendant was taken into federal custody on April 19, 2018, presented before the Magistrate Judge on duty and detained on consent. (ECF No. 5). On May 1, 2018, the defendant was indicted by a grand jury and charged with the same offense as outlined in the complaint. (ECF No. 7). On June 20, 2018, the defendant pleaded guilty to the single count Indictment pursuant to a *Pimentel* letter, dated May 22, 2018.

The Presentence Report ("PSR") calculated a criminal history category of VI and a total offense level of 21, resulting in an advisory Guidelines range of 77 to 96 months' imprisonment. (PSR p. 24). The Probation Department ("Probation") recommended a sentence of 84 months' imprisonment, in part, because of the defendant's extensive criminal history including a May 15, 2019 conviction for assault in which the defendant slashed the victim with a razor after the victim attempted to intervene in a physical altercation between the defendant and his girlfriend. (*See* PSR ¶¶ 64-65). The PSR also cited numerous other arrests where the defendant was accused of committing acts of violence.

On February 15, 2019, after hearing arguments from both sides, the District Court sentenced the defendant to 65 months' imprisonment. Noting the defendant's "staggering criminal history" and the need for specific and general deterrence, Judge Pauley concluded that a below Guidelines sentence was appropriate given the defendant's difficult upbringing. (*See* Sentencing Transcript, ECF No. 22 at 9-10). Judge Pauley sentenced the defendant to 65 months' imprisonment to be followed by a 3 year term of supervised release. (*Id.* at 12).

### C. Violation of Supervised Release

Probation issued a violation report on April 29, 2024 alleging six violations of the defendant's terms of supervised release. The alleged violations arose from the defendant's arrest on March 25, 2023 on state drug charges, his failure to report to and notify Probation as ordered, and several positive urine tests indicating drug use. On August 7, 2024, Probation issued an amended violation report alleging five additional violations of supervised release, arising from the defendant's arrest on May 16, 2024 on state drug charges, his failure to abide by court ordered conditions of home detention, and his use of marijuana as confirmed by two positive urine tests.

On August 19, 2024, the parties reached a pre-hearing resolution whereby the defendant agrees to plead guilty to Specifications 3 through 6 and Specifications 10 and 11 after which and the Government agrees to move to dismiss the remaining open specifications.

### D. Discussion

#### 1. Applicable Law

In determining an appropriate sentence for a supervised release violation, district courts

must consider the subset of Section 3553(a) factors that are incorporated into 18 U.S.C. § 3583(e). *See United States v. Dowdell*, No. 20-4094, 2021 WL 5170728, at *2 (2d Cir. Nov. 8, 2021) ("Under 18 U.S.C. § 3583(e), a district court must consider a subset of the sentencing factors set forth in 18 U.S.C. § 3553(a) when revoking supervised release."). There are eight such factors: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" 18 U.S.C. § 3553(a)(1); (2) "the need for the sentence imposed ... to afford adequate deterrence to criminal conduct;" 18 U.S.C. § 3553(a)(2)(B); (3) "the need for the sentence imposed ... to protect the public from further crimes of the defendant;" 18 U.S.C. § 3553(a)(2)(C); (4) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" 18 U.S.C. § 3553(a)(2)(D); (5) "the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the" Sentencing Guidelines; 18 U.S.C. § 3553(a)(4); (6) "any pertinent policy statement" issued by the Sentencing Commission; 18 U.S.C. § 3553(a)(5); (7) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" 18 U.S.C. § 3553(a)(6); and (8) "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). At the same time, district courts are not prohibited from considering those Section 3553(a) factors that are not specifically incorporated into Section 3583. *United States v. Williams*, 841 F. App'x. 289, 292 (2d Cir. 2021) (summary order).

In weighing the statutory factors and formulating a sentence, courts focus more on the breach of trust implicit in the supervised release violation than on the violation conduct itself. "A defendant's ability to follow [supervised release] conditions reflects the trust placed in him by the sentencing court – essentially, the defendant promises he is 'able to return to society and function as a responsible, self-reliant person.'" *United States v. Peguero*, No. 20-3798, 2022 WL 1510371, at *12 (2d Cir. May 13, 2022) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)). "Thus ... any sanctions resulting from violations of supervised release conditions, even if based on new criminal conduct, 'are first and foremost considered sanctions for the defendant's breach of trust.'" *Id.* (quoting *United States v. Haymond*, 588 U.S. 634, 658 (2019)).

### 2. A Guidelines Sentence Is Appropriate In This Case

Application of the 3553(a) factors calls for a Guidelines sentence of 8 to 14 months' imprisonment in light of the defendant's history and characteristics, the need to afford adequate deterrence to further criminal conduct, and the need to protect the public from further crimes by the defendant. 18 U.S.C. § 3553(a)(1), (a)(2)(B)-(C). These considerations weigh heavily in favor of a sentence within the Guidelines Range.

*First*, and perhaps foremost, a within-Guidelines sentence is necessary to protect the public from further crimes by the defendant. Perhaps most troubling is the defendant's history of violent and aggressive behavior. As Judge Pauley noted at the defendant's sentencing for the underlying charges, the defendant has a "staggering criminal history." He has been arrested over a dozen times with at least thirteen criminal convictions seven of which are felonies, including two previous convictions for possession of a loaded firearm. Most of the defendant's arrests are drug

Hon. Mary Kay VyskocilPage 4
September 30, 2024

related as is the conduct underlying several of the charged specifications.[1] Clearly, the defendant is unable or unwilling to abide by the rules of the Court or society in general. His anti-social behavior extends to his domestic partnerships with several of his arrests involving domestic violence. (PSR ¶¶ 47-59). Simply put, the public is best protected when the defendant is incarcerated.

*Second*, a within-Guidelines sentence is necessary to provide both specific and general deterrence. It is clear that the defendant's previous array of convictions and sentences did not deter him from committing additional crimes and breaching the Court's trust. The defendant has an extensive criminal history dating back to 1996. Despite these multiple arrests and spending over a decade in prison, the defendant has not been deterred from continuing to violate the law or the Court's trust. The need for specific deterrence is especially warranted here. A within-Guidelines sentence will hopefully accomplish what the defendant's prior encounters with the criminal justice system have failed to – i.e., deter him from future crimes of this magnitude, and send a clear signal to others in the community that repeated violations of the law culminating in a crime that poses a serious danger to others will not be taken lightly.

As to general deterrence, a sentence within the Guidelines range would send a message to other supervisees who would consider flouting the Court's admonishments and breaching its trust—that such conduct carries very serious consequences.

### 3. The Defendant's Arguments for Leniency Are Unpersuasive

The Court should reject the defendant's arguments for a variance as they rely on the same considerations that Judge Pauley credited in 2019. Principally, the defendant argues that his request for a downward variance is warranted because of the mental health challenges he faces and because of the hardships he has endured throughout his life. (Def. Mem. at 2). Specifically, the defendant claims that his tragic life story and diagnosis of schizophrenia and PTSD are highly correlated to his anti-social conduct. (*Id.*) As sympathetic as the defendant's background may be, it is, unfortunately, not so out of the ordinary. But, none of these circumstances justify imposing the below-Guidelines sentence proposed by the defendant. The defendant's situation is not unlike those faced by many in society – individuals who do not engage in violent behavior, domestic violence, or drug dealing. More to the point, nothing in the record suggests that the defendant's upbringing made his participation in these violations inevitable. To the contrary, the defendant's continued criminal conduct is indicative of a knowing and willing participation in a pattern of anti-social behavior.

---

[1] While the defendant is pleading to specifications that do not include the conduct described in specifications 1 and 2, or 7 through 9, the Court is permitted to consider this conduct as part of the defendant's history and characteristics. *See United States v. Pugliese*, 805 F.2d 1117, 1122 (2d Cir. 1986) ("[A] district court judge's discretion in sentencing is 'largely unlimited either as to the kind of information he may consider, or the source from which it may come.'") (quoting *United States v. Tucker*, 404 U.S. 446 (1972)).

Hon. Mary Kay Vyskocil  Page 5
September 30, 2024

The defense further claims that he has endured arduous conditions of confinement at the Metropolitan Detention Center ("MDC"). (*Id.* at 3). This, according to the defendant, lends support for his request for a downward variance. While the defendant identifies a host of issues relating to the MDC, none of the stated claims specifically refer to his experience at the facility. Nor has the defendant previously raised any issues with his conditions of confinement with the Government, or the Court. If the defendant had been experiencing conditions that were truly "dangerous" or "barbaric," (*id.* at 3), one would expect that the defendant would have raised these conditions prior to his sentencing submission, but he has not. Indeed, while the MDC has, at times, had challenges, the Government does not agree that the conditions are "abhorrent" as the defendant claims. For example, the MDC has recently implemented a number of changes to address the complaints:

Medical Care: On May 15, 2024, the MDC implemented a new telehealth program to facilitate contact between inmate patients and medical providers in the community. This program makes use of newly installed telehealth equipment. To expand its reach of medical providers to those with guaranteed remote accessibility, the MDC entered into a new formal agreement with a local hospital not previously part of the BOP medical network. By allowing remote patient care, employees who would otherwise escort and supervise detainees during medical visits in the community are freed to focus on in-facility work and maintain a better staff to inmate ratio within the MDC's walls. Furthermore, MDC has taken smaller steps to improve aspects of inmate care. For example, in early-2024, MDC acquired a USee Vision Kit, which allows MDC staff to create temporary glasses for inmates while they await permanent frames from either an optometrist of from the inmate's attorney.

Immediate Staffing Levels: The BOP has taken unprecedented steps to improve staffing at the MDC. In early 2024, all BOP employees (more than 37,000 people in total) received a message offering significant financial incentives for temporary duty assignments at the MDC, to address immediate staffing concerns. These financial incentives are being offered *in addition* to housing, food, and other incidental expenses that BOP pays for temporarily assigned personnel. Participation is open to BOP employees, including attorneys, doctors, counselors, chaplains, and correctional officers, with correctional officers receiving even greater financial incentives. No other BOP facility has benefitted from a temporary assignment call of this scale, and this exceptional effort has led to a surge in the number of the employees at the MDC.

Long-Term Staffing Levels: The BOP has also undertaken measures to ensure staffing challenges at the MDC are addressed in the months and years ahead, not only through temporary assignments. To retain qualified employees, the MDC implemented a 35% retention pay incentive for most incumbent employees. Large hiring events are also being held in the community on a regular basis, including on May 15, 2024. During that event, MDC Brooklyn was able to make more than 35 conditional offers using Direct Hire Authority, which OPM approved for MDC earlier this year. A 25% relocation and recruitment incentive has also been put into effect to increase interest in MDC vacancies. Between October 1, 2023, and May 31, 2024, MDC has hired 48 new staff members which includes 33 correctional officers, seven medical personnel (including

Hon. Mary Kay Vyskocil                                                                                                    Page 6
September 30, 2024

one Paramedic, one Mid-Level Practitioner, three registered nurses, a psychologist, and a pharmacist), two attorneys, one legal assistant, one accounting technician, one case manager, two time & leave clerks, and one unit secretary. As of May 31, 2024, there are currently 66 active tentative offers which have been extended to interested and qualified Correctional Officer and Medical applicants. With its mid-May 2024 inmate population of approximately 1,375 persons and permanent staff total of approximately 457, the staff to inmate ratio is 2.9 inmates per employee. An additional 173 positions are authorized and funded, pending selection of qualified applications. Assuming a consistent inmate population, this will bring the staff to inmate ratio to 2.1 inmates per employee.

In short, the defendant's complaints do not merit leniency.

**E. Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of between 8 and 14 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the stated goals of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: _____
Dominic A. Gentile
Assistant United States Attorney
(212) 637-2567

cc:     Jonathan Marvinny, Esq. (by ECF and Email)